**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TODD BRIGLIN,

                                    Plaintiff,                          9:23-cv-1001 (BKS/TWD)

v.

CLIFFORD HURLEY, GERALD CAHILL, and PRITI
MANDALAYWALA,

                                    Defendants.

**Appearances:**

*For Plaintiff*:
Amy Jane Agnew
Joshua L. Morrison
Law Office of Amy Jane Agnew, P.C.
24 Fifth Avenue, Suite 1701
New York, New York 10011

*For Defendants*:
Oriana L. Kiley
Anna V. Seitelman
Viktoria Yudchits
Whiteman Osterman & Hanna LLP
One Commerce Plaza
Albany, New York 12260

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

        On August 17, 2023, Plaintiff Todd Briglin initiated this action pursuant to 42 U.S.C.

§ 1983 against Defendants David Dinello, Clifford Hurley, Gerald Cahill, and Priti

Mandalaywala alleging a claim for deliberate indifference under the Eighth Amendment. (Dkt.

No. 1.) Plaintiff subsequently moved before the United States Judicial Panel on Multidistrict

Litigation ("MDL Panel") for transfer of the action, along with numerous other actions filed by Plaintiff's counsel, under 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings. (Dkt. No. 5.) On November 18, 2023, Plaintiff filed the operative amended complaint, adding Defendant Carol Moores. (Dkt. No. 17.)[1] On December 7, 2023, the MDL Panel denied Plaintiff's § 1407 motion. *In re N.Y. Dep't of Corr. & Cmty. Supervision Medications With Abuse Potential Prisoner Litig.*, No. MDL 3086, --- F. Supp. 3d ----, 2023 WL 8539909, at *3, 2023 U.S. Dist. LEXIS 219565, at *5 (J.P.M.L. Dec. 7, 2023).

Presently before the Court is Defendants Hurley, Cahill, and Mandalaywala's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 33.) The motion is fully briefed. (Dkt. Nos. 39–41.) For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.

## II.    FACTS[2]

### A.    Medications With Abuse Potential Policy

Plaintiff, who was held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") from, among other times, 2019 to 2021, alleges that Defendants' continued refusal to represcribe certain medications due to DOCCS policies and customs constitutes deliberate indifference. (Dkt. No. 17, ¶¶ 379–85.)

DOCCS' "policy on Medications With Abuse Potential" ("MWAP") was promulgated on June 2, 2017. (*Id.* ¶¶ 144–45.)[3] On its MWAP list, "DOCCS included a group of . . . ubiquitous

---

[1] Plaintiff later voluntarily dismissed Defendant Moores, (Dkt. No. 37), and on July 29, 2024, the parties stipulated to dismissal of Defendant Dinello, (Dkt. Nos. 45–46), leaving only Defendants Hurley, Cahill, and Mandalaywala.

[2] These facts are drawn from the amended complaint. (Dkt. No. 17.) The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] The MWAP policy is codified as DOCCS Health Services Policy 1.24, "Medications with Abuse Potential."

medications, including" medications at issue here: Neurontin (also known as Gabapentin), "an anticonvulsant generally taken to control seizures" and "often prescribed to relieve nerve pain," and Flexeril (also known as Cyclobenzaprine), a muscle relaxer used in short-term doses to control muscle spasms by blocking nerve impulses to the brain. (*Id.* ¶¶ 77, 81, 87.)[4] The medications on the MWAP list "are not risk free," and "[l]ike any medication they can be abused, but many of them—including Neurontin . . . —are considered to have low addiction potential." (*Id.* ¶ 97–98.) "DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades." (*Id.* ¶ 99.)

Under the MWAP policy, a provider must "submit an MWAP Request Form" to the Regional Medical Director ("RMD") in charge of their region. (*Id.* ¶ 157–58.) The MWAP Request Form "asked for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue." (*Id.* ¶ 159.) The MWAP Request Form "also asked if there is any recent evidence of drug diversion or abuse by the patient." (*Id.* ¶ 160.) "Based on the MWAP Request Form contents—the RMD and not the patient's medical provider—determined whether a patient will receive an MWAP." (*Id.* ¶ 163.) The treating physicians and mid-level clinicians "had to discontinue an MWAP prescription if it was not approved by the RMD"; "pharmacies would not fill a prescription for an MWAP without RMD approval"; and providers "had no ability to provide the medication once an RMD refused to approve the prescription." (*Id.* ¶ 167.)

The MWAP policy "had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs." (*Id.* ¶ 173.) "As implemented, the MWAP Policy

---

[4] Although Plaintiff appears to allege that Neurontin was in a 2019 Formulary Book and was therefore available to doctors to prescribe without approval from an administrator, (*id.* ¶¶ 35–36, 38), Plaintiff's allegations as to the MWAP policy and related customs suggest that the MWAP policy altered these practices.

was an almost wholesale restriction on the prescription of MWAPs, except in cases of acute need or palliative care." (*Id.* ¶ 106.) This stands in contravention of the positions of several other agencies, such as the National Commission on Correctional Health Care, of which DOCCS is an accredited member, who published a position indicating that "[c]linicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain)[;] [r]ather clinicians should consider all aspects of the problem and all available proven modalities," and "[p]olicies banning opioids should be eschewed." (*Id.* ¶¶ 107–09.) Similarly, the Federal Bureau of Prisons' ("BOP") Clinical Guideline does not prohibit use of opioids or neuromodulating medications like Neurontin but instead "lists Neurontin . . . as [a] second line treatment[] for neuropathic pain." (*Id.* ¶¶ 111–12.) The American Correctional Association, by which DOCCS is accredited, "lists the BOP Clinical Guideline . . . as its clinical guideline standard." (*Id.* ¶ 113.) The New York State Department of Health "has only two main concerns regarding Neurontin/Gabapentin: it recommended avoiding prescriptions in doses higher than 3600 mg per day because there is no evidence of increase in therapeutic dose, and it recommended avoidance of use of Neurontin by a patient benefiting from concurrent opioid treatment." (*Id.* ¶ 114.) The American Medical Association "also does not restrict the prescription of many of the medications on the MWAP list." (*Id.* ¶ 115.) In fact, "[t]he standard in the medical community is to use medications like Neurontin . . . and other non-opioid MWAPS to treat chronic conditions to reduce the number of opioid prescriptions"; "[t]he standard in the medical community is not to restrict all effective treatment." (*Id.* ¶ 117.)

In February 2021, "as a direct result of class action litigation, DOCCS . . . rescinded the MWAP Policy and promulgated a new policy[,] 1.24A," entitled "Prescribing for Chronic Pain."

(*Id.* ¶ 285.)[5] "The new policy demanded 'Pain management medication should only be discontinued after a provider has met with the patient, discussed the issues regarding the use of the medication, analyzed the patient's situation, and subsequently determined that it is in the best interest of the patient for the medication to be discontinued.[']" (*Id.* ¶ 286.)

### B.    Plaintiff's Medical Issues

Plaintiff "suffered from a number of chronic injuries and related pain and neuropathy," "was deemed disabled by the NY Workers' Compensation Bureau due to his injuries[,] and was effectively treated until 2019 when he drafted into DOCCS and his effective medications, Neurontin and Flexeril, were summarily discontinued without medical justification." (*Id.* ¶ 5.)

Between July 2013 and July 2018, Plaintiff experienced a multitude of medical issues, including, among others, chronic headaches, dizziness, and blurry vision; bilateral hip pain and hip spurs; degenerative disc disease; nerve damage; and multiple hernias. (*See generally id.* ¶¶ 313–31.) On July 28, 2016, a "pain management doctor" diagnosed Plaintiff with "1. Spinal stenosis in the lumbar region. 2. Sacroiliitis. 3. Neuralgia and neuritis. 4. Chronic pain. 5. Chronic pain syndrome." (*Id.* ¶ 325.) Plaintiff's pain management doctor "further noted . . . a diagnosis of pudendal nerve entrapment." (*Id.*) In January 2017, an "independent medical examiner" for a worker's compensation claim assessed Plaintiff as having "1. Chronic lumbar strain with left radiculopathy. 2. Aggravation of lumbar disc disease. 3. Two left groin hernias, on[e] being a sports hernia. 4. Inguinal hernia on right side. 5. Umbilical hernia. 6. Chronic cervical strain. 7. Aggravation of cervical disc disease. 8. Left shoulder strain." (*Id.* ¶ 330–31.) As of December 19, 2016, Plaintiff's "doctors still assessed that he was unable to work due to his

---

[5] Plaintiff appears to be referring to class-action litigation in the Southern District of New York challenging the MWAP policy. *See Allen v. Koenigsmann*, No. 19-cv-8173 (S.D.N.Y.).

injuries," and as of January 23, 2017, Plaintiff "could not put on his socks, could not shovel snow nor do housework, could only drive for short distances, and he spent most of his time in bed." (*Id.* ¶¶ 329–30.)

During this period, Plaintiff experienced chronic pain and was variously treated with Elavil (also known as amitriptyline), which was later discontinued due to adverse side effect; verapamil; ibuprofen; Topamax; Motrin; propranolol; Lyrica; Prilosec; Oxycodone; epidural steroid injections; a "TENS unit"; physiotherapy; groin surgery; and chiropractic. (*Id.* ¶¶ 313–18, 321–22, 325–26, 330–34.) Both during a stint in the custody of DOCCS from July 2013 to April 2015 and out of DOCCS' custody, medical providers prescribed Plaintiff Gabapentin. (*Id.* ¶¶ 315–16, 324, 326, 334.) Gabapentin "was helpful with [Plaintiff's] headaches" and the "gabapentin prescription was slowly increased by [Plaintiff's] medical providers," but Plaintiff complained of nausea and diarrhea caused by the Gabapentin and twice discontinued—but resumed—use of Gabapentin due to those side effects. (*Id.* ¶¶ 315–17, 334.)

On March 12, 2019, Plaintiff was incarcerated in the Steuben County Jail. (*Id.* ¶ 335.) His medication and treatment order provided to him at the Steuben County Jail included "the continuation of his gabapentin 600mg T.I.D.," and Plaintiff "was also noted to need a wheelchair and back brace for mobility." (*Id.*) The Steuben County Jail intake listed diagnoses of neuropathic legs, low back pain, mid back pain, and neck pain" and "additionally noted his pain management prescription of oxycodone 10mg and Lyrica 200 mg." (*Id.*) "The records indicate that the county jail changed Lyrica to gabapentin," and on April 18, 2019, "Steuben County Jail medical staff changed the time of his gabapentin administration to 8am, 1pm, and 5pm." (*Id.* ¶ 336.) Plaintiff's dosage of 600 mg remained the same. (*Id.*)

On April 26, 2019, Plaintiff "was admitted to Downstate Correctional Facility infirmary" in DOCCS custody. (*Id.* ¶ 337.) "When a patient is first 'drafted in' to DOCCS he/she generally resides at a reception facility until staff conducts a medical assessment and a department called 'Movement and Classification' determines the best housing for the patient." (*Id.* ¶ 69.) The medical staff at a reception facility maintain a patient on all the medications and prescriptions they were taking before being "drafted in" to ensure continuity of care. (*Id.* ¶ 70.) "The medical staff at the reception facility conduct a thorough individualized assessment of the patient's health issues for use by practitioners in receiving facilities, and their findings related to major disease or mobility issues are entered into the patient's Medical Problem List." (*Id.* ¶ 71.) Upon transfer to a facility for housing, "a nurse is supposed to conduct an 'assessment[]' of the patient," and if a "prisoner needs medications prescribed, a medical provider is given the medication list to review for ordering." (*Id.* ¶ 72.) The doctor at Downstate "maintained [Plaintiff's] medication orders for gabapentin 600 mg and his muscle relaxant medication (cyclobenzaprine)." (*Id.* ¶ 337.)

On May 3, 2019, Plaintiff "was transferred to Franklin Correctional Facility and admitted to the infirmary." (*Id.* ¶ 338.) Plaintiff's "medication orders show all his medications from Downstate except his Neurontin and Cyclobenzaprine[,] which were both noted 'DC M.'" (*Id.*) Defendant Mandalaywala had not seen Plaintiff before she discontinued his medications." (*Id.*) "She noted 'MD f/u 5/6/19.'" (*Id.*)

"A note on May 8, 2019[,] from a nurse to the doctor stated, 'Came in to facility on Neurontin 600mg . . . was told would be tapered off MD Review. Do you want tapered Neurontin 600mg [once per day]?[']" (*Id.* ¶ 339.) Defendant Cahill "wrote a tapering schedule, but no medical justification for the discontinuation of the Neurontin." (*Id.*) Defendant Cahill "did not see [Plaintiff] nor examine him." (*Id.*) Plaintiff "was denied permission to use a wheelchair

and discharged from infirmary with a cane and back brace," and Plaintiff's "Neurontin

prescription and cyclobenzaprine prescription were immediately discontinued." (*Id.* ¶ 340.)

"Within two weeks, [Plaintiff] was not receiving any Neurontin, and no pain management

assessment or referral was noted to address his pain management needs." (*Id.* ¶ 341.) Plaintiff's

pain was "intense and chronic." (*Id.*)

On May 23, 2019, Plaintiff asked medical staff when he would see a doctor, and on May

28, 2019, Plaintiff was seen by Defendant Cahill, "who noted that [Plaintiff] complained of

increasing neuropathic pain and scheduled him for an EMG." (*Id.* ¶ 342.) Defendant Cahill did

not represcribe Plaintiff's "effective Neurontin prescription." (*Id.*) On May 29, 2019, Defendant

Cahill referred Plaintiff for a CT on his pelvis to evaluate an impingement on the formal nerve,

and Plaintiff "continued to report neuropathic pain and discomfort." (*Id.* ¶ 343.)

Defendant Cahill

> testified under oath that "Dinello ... felt that, especially
> Gabapentin, ... that there was no indication for the use of
> Gabapentin ... so anybody coming in, frequently we would get
> drafts who would come in and were on Gabapentin ... when the
> MWAP form came out, I had to submit that to Dr. Dinello and
> generally he would put people on a tapering program ... and it had
> to be discontinued. So eventually, when I found that we were not
> going to be doing it, you know, we were not going to have it
> approved, I would just start ... my own tapering ... [.]"

(*Id.* ¶ 344.) Defendant Cahill testified that Dinello "was adamant in his directives about these

medications." (*Id.* ¶ 345.) "Because [Defendant] Cahill knew the medication would not be

approved by Dinello, he did not even bother trying to get it for his patients—even when

medically justified." (*Id.*)

On June 3, 2019, Plaintiff was transferred to Groveland Correctional Facility. (*Id.* ¶ 346.)

Plaintiff's "transfer records state he was prescribed Elavil for his pain management, but he was

experiencing adverse effects." (*Id.*) On June 14, 2019, Plaintiff's "previously filed grievance for the discontinuation of his pain medication was denied by the superintendent of Franklin Correctional Facility specifically citing the MWAP policy and the fact that the RMD, David Dinello, was responsible 'to assure that the patient's need for a medication with abuse potential is well documented, justified . . . [.]'" (*Id.* ¶ 347.)

On June 21, 2019, Plaintiff "complained to medical staff of back and groin pain and that he wanted a medical appointment," and Plaintiff's Elavil prescription "was noted as being ordered." (*Id.* ¶ 348.) On June 25, 2019, Plaintiff "submitted another grievance that his injuries were getting worse and he was not receiving proper medical attention." (*Id.* ¶ 349.) On July 10, 2019, Plaintiff "wrote to the medical review board requesting that they review and intervene on his behalf." (*Id.* ¶ 350.)

"Meanwhile, [Plaintiff] was transferred back to Franklin but nothing was prescribed to address his chronic pain and neuropathy." (*Id.*) On July 17, 2019, Plaintiff "complained to sick call of 'burning pain' and severe leg and lower back pain and requested his Elavil dose be increased because his Flexeril and Neurontin were discontinued in May." (*Id.* ¶ 351.) On July 29, 2019, in response to Plaintiff's letter to the medical review commission, the DOCCS Chief Medical Officer ("CMO") stated that "the medical department was aware of his concerns and that an EMG was scheduled." (*Id.* ¶ 352.) "Despite the fact that [the CMO] knew of the MWAP policy and its profound negative impact on patients—including on [Plaintiff]—he did nothing to help." (*Id.*)

On August 3, 3019 Plaintiff "wrote directly to [the CMO] about his complaints in medical treatment including seeing only one doctor since arriving in DOCCS custody, having all his specialty appointments cancelled, being taken off Neurontin for his nerve pain, and being

denied use of a wheelchair," and Plaintiff "requested that [the CMO] intervene." (*Id.* ¶ 353.) The CMO "testified under oath that he reviewed all letters sent to him and would look into patient's complaints," but "[d]espite his investigation, [the CMO] did nothing to help [Plaintiff]." (*Id.* ¶ 354.)

On August 8, 2019, Plaintiff transferred back to Groveland for court appearances. (*Id.* ¶ 355.) On August 23, 2019, Plaintiff "complained to medical staff at Groveland of his left leg pain" and "requested to see mental health because he was not sleeping well and had anxiety about not getting help with his pain." (*Id.* ¶ 356.) On September 3, 2019, the Regional Health Services Administrator responded to Plaintiff's letter; "[s]he cut and pasted the exact same response that Central Office had sent in response to hundreds of letters alerting Central Office that effective medications were being discontinued without medical justification." (*Id.* ¶ 357.) "Specific to [Plaintiff], the response stated he had electrocardiogram on July 31, 2019 and that an EMG had been scheduled," and the letter indicated that Plaintiff "should bring any concerns to his provider." (*Id.* ¶ 358.) The EMG still did not take place. (*Id.*)

On August 23, 2019, Plaintiff "saw medical at Groveland[,] who noted his nerve issues, pain, that he wanted to see a doctor, and that the EMG was ordered." (*Id.* ¶ 359.) "Still nothing was done." (*Id.*)

On September 9, 2019, Plaintiff "wrote to the superintendent of Groveland CF asking him to personally review his medical treatment" and "inform[ing] the superintendent that the judge ordered him to remain at Groveland through his sentencing and that he is being told by Groveland medical staff that they cannot treat him because his home facility is Franklin CF." (*Id.* ¶ 360.) Plaintiff "reported that he had fallen twice and needed medical attention." (*Id.*)

On October 1, 2019, Plaintiff's "long-awaited EMG was canceled through no fault of his own." (*Id.* ¶ 361.) On October 3, 2019, Plaintiff "complained to sick call about his pain and neuropathy and requested an increase in Elavil, which was denied." (*Id.* ¶ 362.) Defendant Hurley "was told that [Plaintiff] needed medication for his neuropathy but responded only 'Elavil doses are ordered as intended.'" (*Id.* ¶ 362.) Defendant Hurley "did not bother to see [Plaintiff]." (*Id.*)

On October 7, 2019, Defendant Hurley "put in the referral for an EMG [and] again noted, 'having neuropathy of left leg and numbness of both feet . . [.] MVA 2015 Lower back pelvic injury has Hx of L4 L5 . . . [.]'" (*Id.* ¶ 363.)

On October 21, 2019, in response to Plaintiff's letter to the DOCCS CMO, Plaintiff "received a letter from [the] Regional Health Services Administrator . . . that stated [Plaintiff] has an appointment with his provider on September 24, 2019[,] and his EMG procedure has been scheduled to occur soon." (*Id.* ¶ 364.) On November 3, 2019, Plaintiff "sent a return correspondence . . . that he still had not seen a doctor and had not been sent for EMG; instead he has been taken off his medication that had been prescribed to treat his nerve pain." (*id.* ¶ 365.)

By November 12, 2019, Plaintiff was back in Franklin. (*Id.* ¶ 366.) Plaintiff "was seen by [Defendant] Cahill[,] who noted that he presented with chronic pain syndrome with neuropathy to both upper and lower extremities." (*Id.*) Defendant Cahill "noted that [Plaintiff] needed pain control, an MRI and that an EMG should be ordered," but "[w]hen [Defendant] Cahill ordered the MRI, Dinello denied it." (*Id.* ¶ 367.)

On December 31, 2019, Plaintiff "finally was approved for an EMG & NCV study for his neuropathy," and the test "confirmed 'chronic radiculopathy involving the L>R L4, L5 roots.'"

(*Id.* ¶ 368.) Defendant Cahill "still did not prescribe [Plaintiff's] effective treatment, Neurontin." (*Id.*) On January 27, 2020, Plaintiff was seen for a physical therapy appointment. (*Id.* ¶ 369.)

In April 2020, Plaintiff's ibuprofen "was discontinued without him ever seeing his provider because a nurse believed that ibuprofen was aspirin for which he has an allergy." (*Id.* ¶ 370.) On April 26, 2020, Plaintiff wrote a letter to the Franklin nurse administrator "about the discontinuation of his ibuprofen, his worsening pain and that the Tylenol replacement does not help his pain." (*Id.* ¶ 371.) On May 12, 2020, Plaintiff "filed a grievance over his discontinuation of medication without seeing a doctor." (*Id.* ¶ 372.) On September 17, 2020, Plaintiff "attended another physical therapy appointment and complained of continued back pain." (*Id.* ¶ 372.)

On October 5, 2020, Plaintiff "started talking Cymbalta[,] which was ineffective in treating his chronic pain and neuropathy." (*Id.* ¶ 373.) On October 19, 2020, Defendant Mandalaywala "completed an MWAP and Chronic Pain Patient Reassessment form" and "noted that [Plaintiff's] Neurontin was stopped and switched to Elavil and his pain scale was 8 out of 10." (*Id.* ¶ 374.) Defendant Mandalaywala "did not identify the discontinuation of his Flexeril in her assessment," "did not identify which therapies were helpful or not helpful," "did not identify the discontinuation of [Plaintiff's] ibuprofen," and "did not identify [Plaintiff's] EMG findings of chronic radiculopathy in his L4 and L5 roots." (*Id.*) Defendant Mandalaywala "originally seemed to recommend [Plaintiff] be returned to Neurontin but crossed that recommendation out and suggested only that his Cymbalta be increased." (*Id.* ¶ 375.)

In April 2021, Plaintiff was released from DOCCS' custody. (*Id.* ¶ 376.) Plaintiff "immediately sought treatment and MRIs were performed." (*Id.*) "The MRIs showed T6-T7 right paracentral disc protrusion, degenerative changes at L4-L1, moderate to severe bilateral neural foraminal narrowing at the L4- L5[,] and severe bilateral neural foraminal narrowing at L5-S1."

(*Id.*) Plaintiff's physician "immediately prescribed Neurontin and cyclobenzaprine for [Plaintiff's] pain management" and "recommended an updated MRI of his lumbar and thoracic spine for the placement of a spinal cord stimulator trial for his CRPS with Boston Scientific." (*Id.* ¶ 377.) Plaintiff "continues to be effectively treated on the outside, but only because he was released from DOCCS' custody." (*Id.* ¶ 378.)

Plaintiff alleges that he "was a victim of [a] grand plan" that involved certain DOCCS medical administrators determining "to remove certain medications from DOCCS[] facilities— not based on patients' needs or efficacy—but the perceived 'abuse potential' of the medication" and that "patients like [Plaintiff] [who] had the misfortunate to be housed in facilities within Dinello's [region] [had] their medications . . . discontinued by providers—sometimes just at transfer, or for unconfirmed reports by security of diversion attempts, or because facilities did not 'give that here.[']" (*Id.* ¶¶ 380–81, 383.) Plaintiff alleges that "DOCCS' Central Office started marking each facility's ability to get their patients off the medications" and that "[d]iscontinuations were done without medical justification or individualized assessments." (*Id.* ¶ 382.) "Despite having his medical records for review, Defendant[s] . . . continuously refused to represcribe [Plaintiff's] effective treatment due to these policies and customs." (*Id.* ¶ 384.) Plaintiff "repeatedly and consistently reported his pain and suffering to no avail," and Plaintiff "suffered severely due to Defendant['s] adherence to the[se] customs, policies and practices." (*Id.* ¶¶ 384–85.)

## III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not

contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006), "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court may also consider a document on which "the complaint 'relies heavily . . . ,' thereby rendering the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *DiFolco*, 622 F.3d at 111). But "[m]erely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (second alteration in original) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)).

## IV. DISCUSSION

### A. Statute of Limitations

Defendants argue that Plaintiff's claim is time-barred and must therefore be dismissed. (Dkt. No. 33-1, at 12–16.) Plaintiff argues that he is entitled to (1) equitable tolling during the

14

period in which Plaintiff was exhausting administrative remedies; (2) tolling pursuant to COVID-related executive orders; and (3) tolling under the continuing violation doctrine. (Dkt. No. 40, at 20–27.) Defendants argue (1) Plaintiff has not sufficiently pleaded facts demonstrating that he is entitled to equitable tolling arising from the administrative-exhaustion process; (2) even applying tolling pursuant to COVID-related executive orders, Plaintiff's claim is still untimely; and (3) Plaintiff has not alleged acts within the relevant statutory period that are traceable to policy of deliberate indifference that would render the continuing violation policy applicable. (Dkt. No. 41, at 4–9.)

"The statute of limitations for § 1983 actions arising in New York is three years." *Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020); *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) ("The statute of limitations for claims brought under Section 1983 is governed by state law, and [for an Eighth Amendment deliberate indifference claim] is the three-year period for personal injury actions under New York State law."). "A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.'" *Shomo*, 579 F.3d at 181 (quoting *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994)). "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *See Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)).

Here, Plaintiff filed his complaint on August 17, 2023. (Dkt. No. 1.) Absent tolling, Plaintiff's claim must have accrued within the three-year period ending on the date on which Plaintiff filed his complaint. In other words, Plaintiff's claim must have accrued on or after

August 17, 2020. Because, based on the face of the amended complaint, all of the alleged acts

involving Defendants Hurley and Cahill and all but one of the alleged acts involving Defendant

Mandalaywala occurred prior to that date, the Court will examine Plaintiff's arguments as to

tolling of the statute-of-limitations period.

### 1.    Continuing Violation Doctrine

Plaintiff argues that he is entitled to tolling under the continuing violation doctrine. (Dkt.

No. 40, at 26–27.) The "continuing violation doctrine is an 'exception to the normal knew-or-

should-have-known accrual date,'" *Shomo*, 579 F.3d at 181 (quoting *Harris v. City of New York*,

186 F.3d 243, 248 (2d Cir. 1999)), which the Second Circuit has applied to Eighth Amendment

deliberate indifference claims, *see Williams v. Annucci*, No. 20-cv-1417, 2021 WL 4775970, at

*3, 2021 U.S. Dist. LEXIS 196917, at *8 (N.D.N.Y. Oct. 13, 2021) (collecting cases). The

continuing violation doctrine "applies to claims 'composed of a series of separate acts that

collectively constitute one unlawful [] practice.'" *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir.

2015) (alteration in original) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d

Cir. 2004)). "To assert a continuing violation for statute of limitations purposes" in the context of

an Eighth Amendment claim for deliberate indifference, "the plaintiff must 'allege both the

existence of an ongoing policy of [deliberate indifference to his or her serious medical needs]

and some non-time-barred acts taken in the furtherance of that policy.'" *Id.* at 182 (alteration in

original) (quoting *Harris*, 186 F.3d at 250). This is because "[w]hen the plaintiff brings a Section

1983 claim challenging a . . . policy [of deliberate indifference], 'the commencement of the

statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'"

*See id.* at 181–82 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). The

continuing violation doctrine does not, however, apply to "discrete unlawful acts, even if those

discrete unlawful acts are part of 'serial violations.'" *See Lucente*, 980 F.3d at 309 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)).

In the context of an alleged continuing violation, if a plaintiff alleges "some [] act that did occur within the statute of limitations, so that his claim would not be time-barred," *Harris*, 186 F.3d at 250, and "[t]he complaint suggests a pattern" of deliberately indifferent treatment, *see Shomo*, 579 F.3d at 182, an Eighth Amendment claim for deliberate indifference can withstand a challenge for failure to state a claim. Where a plaintiff brings a claim against multiple defendants, the plaintiff must allege a non-time-barred act as to each defendant. *See id.* at 183 ("The continuing violation doctrine does not apply to the claim against [the individual defendant] because there is no indication that [the plaintiff] is able to allege acts involving [that defendant] that fall within the three-year statutory period."); *Lucente*, 980 F.3d at 310 (holding that Section 1983 claims could proceed against certain individual defendants "as long as each plaintiff alleged an unconstitutional act committed by each particular defendant that falls within the three-year statutory period"). Here, Plaintiff has not alleged any acts by Defendants Hurley or Cahill after August 17, 2020. While Plaintiff has alleged an act by Defendant Mandalaywala in October 2020, as discussed further below, Plaintiff has not plausibly alleged a claim for Eighth Amendment deliberate indifference against Defendant Mandalaywala. Accordingly, the Court need not consider whether the continuing violation doctrine renders such a claim timely.[6]

### 2.     COVID-Related Tolling

Plaintiff also argues that he is entitled to tolling pursuant to COVD-related executive orders. (Dkt. No. 40, at 26.) On March 7, 2020, then-New York State Governor Andrew Cuomo

---

[6] For the same reason, Court does not consider the applicability of tolling pursuant to COVID-related executive orders or during the period in which Plaintiff was exhausting administrative remedies with respect to Plaintiff's claim against Defendant Mandalaywala.

issued Executive Order 202, declaring a disaster emergency for the State of New York due to the COVID-19 pandemic. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 8.202. On March 20, 2020, Governor Cuomo signed Executive Order 202.8, limiting court operations to "essential matters" and declaring that "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding as prescribed by the procedural laws of the state . . . is hereby tolled from the date of this executive order until April 19, 2020." *Id.* § 8.202.8. Nine subsequent Executive Orders collectively extended the first order until November 3, 2020. *See id.* §§ 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.63, 8.202.67. Executive Order 202.72 provided that the tolling of time limits established by Executive Order 202.8 would no longer be in effect as of November 4, 2020. *id.* § 8.202.72, yielding a total tolling period of 228 days.

Because federal courts "borrow not only a state's limitations period but also its 'tolling rules,' . . . unless applying the state's tolling rules 'would defeat the goals of the federal statute at issue,'" *Pearl*, 296 F.3d at 80, "Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including . . . § 1983 claims," *Bell v. Saunders*, No. 20-cv-256, 2022 WL 2064872, at *4–5, 2022 U.S. Dist. LEXIS 101994, at *9–10, *12 (N.D.N.Y. June 8, 2022) (quoting *Rich v. State of New York*, No. 21-cv-3835, 2022 WL 992885, at *8, 2022 U.S. Dist. LEXIS 60779 (S.D.N.Y. Mar. 31, 2022)) (collecting cases).

Here, the amended complaint contains allegations of acts by Defendants Hurley and Cahill that occurred immediately prior to and during the period covered by the COVID-related executive orders, (*see, e.g.,* Dkt. No. 17, ¶¶ 338, 342, 362, 374), and therefore, the statute-of-limitations period for Plaintiff's claim was tolled for 228 days. However, as Defendants point out, this tolling period alone is insufficient to render the alleged acts of Defendants Hurley and

Cahill actionable. Plaintiff alleges acts by Defendant Hurley in October 2019, (*id.* ¶¶ 362–63), and Defendant Cahill in May, November, and December 2019, (*id.* ¶¶ 339, 342–45, 366–68). A claim based on these alleged acts would not be rendered timely by COVID-related tolling alone.[7] Thus, the Court must examine the remaining tolling argument put forth by Plaintiff with respect to Defendants Hurley and Cahill.

### 3.      Tolling During Administrative Exhaustion

Plaintiff argues that he is entitled to tolling during the period in which he was pursuing administrative remedies. (Dkt. No. 40, at 21–25.) Defendants argue that Plaintiff has not sufficiently alleged circumstances warranting tolling and that the Court may not consider documents attached to Plaintiff's opposition to Defendants' motion. (Dkt. No. 41, at 5–7.)

First, the Court addresses the grievance-related documents attached to Plaintiff's opposition to Defendants' motion to dismiss. (Dkt. No. 39-1.) Defendants are correct that consideration of a motion to dismiss under Rule 12(b)(6) is limited to the complaint itself and any document attached to, incorporated by reference into, or integral to the complaint. *See Faulkner*, 463 F.3d at 134; *DiFolco*, 622 F.3d at 111; *Nicosia*, 834 F.3d at 230. The documents at issue are not attached to or incorporated by reference into the amended complaint. And because the contents of the documents do not "appear to have been necessary to the 'short and plain statement of the claim showing that [Plaintiff] entitled to relief'" and Plaintiff does appear to have "rel[ied] on the terms and effect of [the] document[s] in drafting the complaint,'" *see Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 436 (S.D.N.Y. 2022) (third alteration in original) (first quoting *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir.

---

[7] That is, these alleged acts fall outside the period of three years plus 228 days ending on the date on which Plaintiff filed his complaint.

2008), and then quoting *Glob. Network Commc'ns, Inc.*, 458 F.3d at 156), the documents are not integral to the amended complaint. Thus, the Court will not consider these documents in deciding Defendants' motion.[8]

Next, the Court considers whether, based on the amended complaint, Plaintiff is entitled to tolling during the period in which he was pursuing administrative remedies. In *Gonzalez v. Hasty*, the Second Circuit held "that the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process [under the Prison Litigation Reform Act ('PLRA')]." 651 F.3d 318, 323–24 (2d Cir. 2011) (quoting *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005)).[9] The tolling period begins when a plaintiff first raises an administrative claim and ends when the plaintiff's administrative remedies are deemed exhausted. *Gonzalez*, 651 F.3d at 324 ("[T]he applicable three-year statute of limitations is tolled only during that exhaustion period and not during the period in between the accrual of those claims and when [the plaintiff] began the administrative remedy process."). That is, the applicable statute-of-limitations period is tolled during the time that an inmate is "actively exhausting [administrative] claims." *See id.*[10]

---

[8] Under Rule 12(d), a court must convert a motion to dismiss under Rule 12(b)(6) to one for summary judgment under Rule 56 where "matters outside the pleadings are presented to and not excluded by the court" and where all parties are "given a reasonable opportunity to present all the material that is pertinent to the motion." The Court declines to do so here and instead excludes the extrinsic documents from consideration in deciding Defendants' motion to dismiss.

[9] The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Proper exhaustion of administrative remedies is dependent on the rules and regulations of the prison in which the grievance is filed; thus, an inmate of a DOCCS facility must satisfy the requirements set forth by DOCCS regulations. *See Garcia v. Heath*, 74 F.4th 44, 46 (2d Cir. 2023). In brief, DOCCS regulations set out a three-step administrative process: First, the inmate must submit a grievance to the Inmate Grievance Resolution Committee. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a)(1). Second, the inmate must appeal a denial of that grievance to the correctional facility's superintendent. *See id.* § 701.5(c). Third, the inmate must appeal a superintendent's denial to the Central Office Review Committee ("CORC"). *See id.* § 701.5(d).

[10] Defendants' argument that Plaintiff failed to allege "extraordinary circumstances," (Dkt. No. 41, at 6–7), misses the mark. Under *Gonzalez*, Plaintiff need not demonstrate that extraordinary circumstances prevented him from timely filing his suit; rather, Plaintiff's prior status as an inmate under the custody of DOCCS and the attendant pre-filing exhaustion requirements imposed by the PLRA "prevented [him] from filing" and therefore entitle him to tolling of

Plaintiff alleges in the amended complaint that he filed at least three grievances related to alleged acts underlying this action. (Dkt. No. 17, ¶¶ 347, 349, 372.) Plaintiff also refers to one denial of a grievance by the superintendent of Franklin, (*id.* ¶ 347), from which the Court can infer that Plaintiff appealed at least one grievance, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(c). Taking these allegations as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has plausibly alleged that he was "actively exhausting [administrative] claims," *Gonzalez*, 651 F.3d at 324, for at least some portion of his incarceration with DOCCS from 2019 to 2021. However, it is not clear from the face of the amended complaint precisely how long Plaintiff was undertaking the required administrative-exhaustion process—that is, it is not clear on the face of the amended complaint when his claims were exhausted. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d) (describing appeal to the central office review committee as the third step in grievance process).

"'Dismissal under [Rule] 12(b)(6) is appropriate when a defendant raises' . . . timeliness[] 'as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)). Because it is not clear on the face of the amended complaint how long Plaintiff was actively exhausting his administrative claims—and, consequently, how long the applicable statute-of-limitations period should be tolled under *Gonzalez*—the Court cannot conclude that Plaintiff's claim is barred as a matter of law. *See Williams v. Annucci*, No. 20-cv-1417, 2021 WL 4775970, at *4, 2021 U.S. Dist. LEXIS 196917, at *11 (N.D.N.Y. Oct. 13,

---

the statute-of-limitations period while he was actively exhausting administrative remedies. *See Gonzalez*, 651 F.3d at 322 (emphasis omitted) (quoting *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004)).

2021) ("The parties have not addressed how long it took Plaintiff to complete the exhaustion process . . . and for how long the statute of limitations applicable to his claims should be tolled. Accordingly, the Court cannot determine from the face of the [operative complaint] that any of Plaintiff's claims are 'barred as a matter of law.'" (citation omitted)); *Hirsch v. Rehs Galleries, Inc.*, No. 18-cv-11864, 2020 WL 917213, at *5, 2020 U.S. Dist. LEXIS 32926, at *11 (S.D.N.Y. Feb. 26, 2020) ("[I]t is not 'clear from the face of the complaint . . . that [P]laintiff's claims are barred as a matter of law,' and there is 'some doubt as to whether dismissal is warranted,' . . . . Therefore, because Plaintiff's Amended Complaint cannot be dismissed on statute of limitations grounds at this juncture, Defendant's motion to dismiss is DENIED." (second and third alterations in original) (citations omitted)). Accordingly, Defendants' motion to dismiss Plaintiff's claims as to Defendants Hurley and Cahill as time-barred is denied.[11]

### B.      Eighth Amendment Deliberate Medical Indifference

Defendants argue that Plaintiff has not plausibly alleged (1) the personal involvement of Defendant Hurley in the alleged deprivation; or (2) that Defendants Hurley, Cahill, or Mandalaywala knew of and disregarded an excessive risk to Plaintiff's health. (Dkt. No. 33-1, at 18–25.) Plaintiff argues that he has alleged the personal involvement of Defendant Hurley and that "Defendants reflexively followed DOCCS' policy[,] ignored the individual medical needs of Plaintiff," and "deliberately and blindly followed DOCCS' policy and replaced Plaintiff's effective treatment with easier and knowingly less efficacious medication." (Dkt. No. 40, at 15–20.)

---

[11] This denial is without prejudice to renew the argument as to untimeliness under *Gonzalez* after completion of discovery.

The Eighth Amendment, applicable to the states through the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 666–67 (1962), prohibits the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. This prohibition establishes "the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (alteration in original) (quoting *Estelle*, 429 U.S. at 104). "The standard of deliberate indifference includes both subjective and objective components." *Id.* "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Id.* (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries": (1) "whether the prisoner was actually deprived of adequate medical care," and (2) "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006).

The first inquiry under the objective component requires examining "whether the prisoner was actually deprived of adequate medical care." *Id.* at 279. Prison officials who act "reasonably" in response to an inmate's health risk will not be found liable because the official's duty is only to provide "reasonable care." *Id.* at 279–80. The second inquiry under the objective component requires examining whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. If the "unreasonable care" consists of a failure to provide treatment, then the court must examine whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would

find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Id.* (alteration in original) (quoting *Chance*, 143 F.3d at 702). "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower," *id.*, and it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant," *Smith*, 316 F.3d at 186 (citing *Chance*, 143 F.3d at 702–03).

As to the subjective component of a deliberate indifference claim, a plaintiff must show that the defendant "act[ed] with a sufficiently culpable state of mind." *Chance*, 143 F.3d at 702 (quoting *Hathaway*, 37 F.3d at 66). The defendant's "state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. That is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105–06. Nor does the "mere disagreement over the proper treatment . . . create a constitutional claim[;] [s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

### 1. Defendant Hurley

Defendants argue that Plaintiff has not alleged the personal involvement of Defendant Hurley in the alleged deprivation and that Plaintiff has not alleged that Defendant Hurley "knew of and disregarded an excessive risk by failing to increase [Plaintiff's] Elavil." (Dkt. No. 33-1, at

18–21.) Plaintiff argues that he has plausibly alleged a violation of his rights by Defendant Hurley. (Dkt. No. 40, at 19–20.)

Plaintiff's Eighth Amendment deliberate indifference claim is premised on Defendants' alleged adherence to DOCCS policies and customs related to the MWAP policy and refusal to represcribe certain medications on the MWAP list without medical justification or individualized assessments. (*See* Dkt. No. 17, ¶¶ 380–85.) But Plaintiff's allegations involving Defendant Hurley are limited to two paragraphs. Plaintiff alleges that on October 3, 2018, he "requested an increase in Elavil, which was denied," and "[Defendant] Hurley was told that [Plaintiff] needed medication for his neuropathy but responded only 'Elavil doses are ordered as intended'" and "did not bother to see" Plaintiff. (*Id.* ¶ 362). On October 7, 2019, Defendant Hurley "put in the referral for an EMG again noted, 'having neuropathy of left leg and numbness of both feet . . [.] MVA 2015 Lower back pelvic injury has Hx of L4 L5 . . . [.]" (*Id.* ¶ 363.) Plaintiff does not allege how Defendant Hurley's refusal to increase Plaintiff's Elavil dose is related to any policy or custom at issue: Plaintiff does not allege that Elavil, unlike Neurontin and Cyclobenzaprine, was on the MWAP list or was otherwise affected by the MWAP policy or related customs. Thus, Plaintiff has not plausibly alleged that Defendant Hurley's denial of Plaintiff's request for an increase in Elavil was based on the MWAP policy or related customs at the exclusion of medical judgment.[12] And, in any event, these limited allegations concerning Defendant Hurley are insufficient to plausibly allege that he knew of and disregarded an excessive risk to Plaintiff's health or safety. Accordingly, Defendants' motion to dismiss is granted with respect to Defendant Hurley.

---

[12] Nor does Plaintiff allege that Defendant Hurley was aware, either through medical records or directly from Plaintiff, of prior use of Neurontin and Cyclobenzaprine in treating Plaintiff's conditions; rather, Plaintiff alleges that his "transfer records [at Groveland] state that he was prescribed Elavil for his pain management, but he was experiencing adverse effects." (*Id.* ¶ 346.)

### 2.      Defendant Cahill

Defendants next argue that Plaintiff has failed to plausibly allege that Defendant Cahill knew of and disregarded an excessive risk to Plaintiff's health by refusing to represcribe Neurontin. (Dkt. No. 33-1, at 21–23.) Plaintiff argues that he has plausibly alleged that "Defendants knew the best course of treatment was to continue to prescribe Plaintiff's effective treatment, but, instead, they deliberately and blindly followed DOCCS' policy and replaced Plaintiff's effective treatment with easier and knowingly less efficacious medication" and that this treatment, which was not based on medical judgment, establishes "a *prima facie* deliberate indifference claim." (Dkt. No. 40, at 16–19.)

Plaintiff has alleged that he suffers from numerous serious medical issues that, during the relevant time, resulted in Plaintiff experiencing, inter alia, chronic neuropathic pain. (*See, e.g.*, Dkt. No. 17, ¶¶ 5, 335, 341–43, 362–63, 366, 373.) Defendants do not argue that Plaintiff has failed to plead that this was, in objective terms, sufficiently serious. Rather, Defendants' motion with respect to Defendant Cahill is premised on the contention that Plaintiff has not plausibly alleged that Defendant Cahill knew of and disregarded an excessive risk of substantial harm to Plaintiff because Plaintiff has not alleged that Defendant Cahill "was aware of any reliable information to suggest that Neurontin had previously been effective for Plaintiff" and because Defendant Cahill "ordered different tests for Plaintiff." (Dkt. No. 33-1, at 22.)

Plaintiff alleges that his prescriptions for Neurontin and Cyclobenzaprine were maintained when he entered DOCCS custody at Downstate on April 26, 2019, and that when he was transferred to Franklin on May 3, 2019, his "medication orders" included notations of his prior Neurontin and Cyclobenzaprine prescriptions. (Dkt. No. 17, ¶¶ 337, 338.) Plaintiff alleges that five days later, Defendant Cahill "wrote a tapering schedule" to discontinue Plaintiff's Neurontin prescription with "no medical justification for the discontinuance" and without seeing

or examining Plaintiff. (*Id.* ¶ 339.) Thus, Plaintiff has plausibly alleged that Defendant Cahill was aware of Plaintiff's prior prescriptions for Neurontin and Cyclobenzaprine. Furthermore, Plaintiff has alleged that Defendant Cahill was aware of Plaintiff's uncontrolled and worsening chronic neuropathic pain as early as May 23, 2019, and as late as December 31, 2019, (*id.* ¶¶ 342–43, 366, 368), but that Defendant Cahill did not adequately address it, (*id.* ¶¶ 342, 366, 368). Plaintiff alleges that discontinuations of MWAP medications in general "were done without medical justification or individualized assessments." (*Id.* ¶ 382.) And Plaintiff alleges that Defendant Cahill wrote the tapering schedule for discontinuing Neurontin with "no medical justification" and without seeing or examining Plaintiff. (*Id.* ¶ 339.) Plaintiff did not receive any "pain management assessment or referral to address his pain management needs." (*Id.* ¶ 341.) Defendant Cahill testified that he did not even try to get MWAP medications like Neurontin for his patients, even when it was medically justified, because he knew the medication would not be approved. (*Id.* ¶ 345.) Defendant Cahill did not represcribe Neurontin even after noting in November 2019 that Plaintiff had "chronic pain syndrome with neuropathy to bother upper and lower extremities," that Plaintiff "needed pain control," and after a December 31, 2019 neuropathy study confirmed "chronic radiculopathy." (*Id.* ¶ 345.)

Plaintiff has also alleged that he was a "victim of [a] grand plan" under which medications were removed from DOCCS facilities based on policies and customs related to the perceived abuse potential of the medicines, not based on patients' needs or efficacy; that discontinuances were done "without medical justifications or individualized assessments"; that doctors, including Defendant Cahill, continued to refuse to represcribe Plaintiff's effective treatment "due to these policies and customs"; that Plaintiff "suffered severely due to Defendants' adherence to the[se] customs, policies and practices," which were at odds with

standards accepted in the medical community. (*Id.* ¶¶ 106–17, 380–85); *see Brock v. Wright*, 315 F.3d 158, 167 (2d Cir. 2003) ("[T]he policy [precluding use of certain medications], the jury may conclude, represents a conscious choice by DOCS to prescribe '"easier and less efficacious" treatment plan[s]' . . . . Such a choice violates the Eighth Amendment." (third alteration in original) (citations omitted)).

Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has plausibly alleged that Defendant Cahill knew of Plaintiff's sufficiently serious condition—that is, his worsening chronic neuropathic pain, *see Jahad v. Holder*, No. 19-cv-4066, 2023 WL 8355919, at *6, 2023 U.S. Dist. LEXIS 215553, at *16–17 (S.D.N.Y. Dec. 1, 2023) (collecting cases and holding that prolonged chronic pain constitutes a "sufficiently serious deprivation")—and disregarded a risk to Plaintiff's health by failing to exercise medical judgment or conduct an individualized assessment to address it. Thus, at this early stage of the case, the Court declines to rule as a matter of law that Plaintiff has failed to state an Eighth Amendment deliberate indifference claim against Defendant Cahill. *See Chance*, 143 F.3d at 703; *see also Tavares v. N.Y.C. Health & Hosps. Corp.*, No. 13-cv-3148, 2015 WL 158863, at *6, 2015 U.S. Dist. LEXIS 3815, at *18 (S.D.N.Y. Jan. 13, 2015) ("The allegation that a physician chose to give less efficacious treatment for reasons not deriving from medical judgment can support a deliberate indifference claim."); *Stevens v. Goord*, 535 F. Supp. 2d 373, 388 (S.D.N.Y. 2008) (stating that "judgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment . . . may provide the basis of a claim" for deliberate indifference under the Eighth Amendment).[13] The fact that Defendant Cahill ordered diagnostic

---

[13] Defendants' argument that Plaintiff's allegations as to Neurontin causing Plaintiff negative side effects demonstrate Defendant Cahill's "conscious *regard* to Plaintiff's health and safety," (Dkt. No. 33-1, at 22–23; *see also* Dkt. No. 41, at 11), is unavailing. While Plaintiff does allege that he experienced negative side effects from Neurontin in 2014 and 2018, (Dkt. No. 17, ¶¶ 316–17, 334), prior to any interaction with any Defendant, there is no allegation that Defendant

tests for Plaintiff, including EMGs and an MRI, (Dkt. No. 17, ¶¶ 342, 367), does not belie this conclusion because "even if an inmate receives 'extensive' medical care, a claim is stated if . . . the gravamen of his problem is not addressed," *Sulton v. Wright*, 265 F. Supp. 2d 292, 298 (S.D.N.Y. 2003), *abrogated on other grounds by Richardson v. Goord*, 347 F.3d 431 (2d Cir. 2003).

Defendants are correct that "mere disagreement over the proper treatment does not create a constitutional claim." *See Chance*, 143 F.3d at 703. But this is so where there exists such disagreement *and* the provided medical treatment, based on medical judgment, is adequate. *See id.* ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Cases on which Defendants rely demonstrate this requirement. *See, e.g., McLean v. Ferguson*, No. 20-cv-1115, 2021 WL 6750544, at *5, 2021 U.S. Dist. LEXIS 214589, at *14 (N.D.N.Y. Nov. 5, 2021) ("Plaintiff's allegations amount to a 'mere disagreement over the proper treatment' of his pain . . . [because] Plaintiff appears to rest his claim on the basis that, because he was previously prescribed meloxicam, he was entitled to receive meloxicam moving forward. However, the record establishes [the defendant] *exercised her medical judgment* to determine Plaintiff did not require prescription medication . . . ." (emphasis added) (citation omitted)), *report and recommendation adopted*, 2022 WL 252162, 2022 U.S. Dist. LEXIS 15250 (N.D.N.Y. Jan. 27, 2022); *Banks v. Annucci*, 48 F. Supp. 3d 394, 410 (N.D.N.Y. 2014) ("Although plaintiff claims that defendant . . . performed a 'half-hearted' examination of plaintiff[] . . . , he nonetheless [provided plaintiff with adequate medical treatment]."); *Rush v. Fischer*, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013)

---

Cahill was aware of this history of side effects and Plaintiff has alleged that Defendant Cahill's decisions were based on DOCCS policies and customs.

("[T]he plaintiff has provided no factual allegations that the [medical] decision . . . deviated from *reasonable medical practice* . . . ." (emphasis added)), *aff'd sub nom. Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016) (summary order).

Here, Plaintiff alleges that MWAP medications were removed from DOCCS facilities based on policies and customs related to the perceived abuse potential of the medicines, not based on patients' needs or efficacy; that discontinuances were done "without medical justifications or individualized assessments"; that Defendant Cahill continued to refuse to represcribe Plaintiff's effective treatment "due to these policies and customs"; and that Plaintiff "suffered severely due to Defendants' adherence to the[se] customs, policies and practices," which were at odds with standards accepted in the medical community. (Dkt. No. 17, ¶¶ 106–17, 380–85). Thus, Plaintiff has plausibly alleged inadequate medical treatment rendered by Defendant Cahill that was not based on individualized assessment or on medical judgment, which renders Defendants' reliance on cases involving "mere disagreement" or other dissatisfaction with adequate treatment inapt.[14]

In reply, Defendants argue that even if any Defendants acted in "reflexive" compliance with DOCCS policies and customs, that is still not enough to establish Plaintiff's claim because

---

[14] Plaintiff's citation of *Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005), is of limited utility. In *Johnson*, the Second Circuit relied predominantly on the fact that "every single one of [the] plaintiff's treating physicians, including prison physicians, indicated to the defendants that prescribing [a certain medication] to the plaintiff was the medically appropriate course of treatment" but the defendants "ignore[d] the unanimous advice of [the plaintiff's] treating physicians." *See* 412 F.3d at 404; *cf. Allen v. Koenigsmann*, No. 19-cv-8173, 2022 WL 1597424, at *6–7, 2022 U.S. Dist. LEXIS 90413, at *16–19 (S.D.N.Y. May 19, 2022) ("Plaintiffs have adequately pleaded facts to permit the [c]ourt to infer that [the defendants'] dismissal of specialty doctors' recommendations of MWAP medications without explanation diverged from reasonable medical practices because of the MWAP policy and not [the defendants'] medical judgment. . . . Thus, [the defendants'] motion to dismiss for failure to state a claim is denied."). Here, there are no allegations that any Defendant ignored the advice of any other medical professional. Nevertheless, accepting all facts in the amended complaint as true and drawing all reasonable inferences in Plaintiff's favor, the amended complaint plausibly alleges that Defendant Cahill was aware of Plaintiff's prior treatments and was therefore "put on notice [of what] the medically appropriate decision could be," and Plaintiff's allegations of Defendant Cahill's refusal to represcribe Plaintiff's effective treatment for debilitating pain due to DOCCS policies and customs that was not based on patients' needs or efficacy plausibly state an Eighth Amendment deliberate indifference claim, *see Johnson*, 412 F.3d at 406, at the motion to dismiss stage.

"[f]ollowing a mandatory prison policy, without more, does not amount to a 'conscious disregard of a substantial risk of harm.'" (Dkt. No. 31, at 6 (citation omitted).) But Defendants point to no case to suggest that compliance with policies or customs *at the exclusion* of individualized assessments or exercises of medical judgment is insufficient to state an Eighth Amendment deliberate indifference claim; indeed, such compliance does support an Eighth Amendment deliberate indifference claim. *See Brock*, 315 F.3d at 167; *Stevens*, 535 F. Supp. 2d at 388; *Tavares*, 2015 WL 158863, at *6, 2015 U.S. Dist. LEXIS 3815, at *18. And here, Plaintiff expressly alleges that Defendant Cahill refused to represcribe certain treatments for Plaintiff's debilitating pain due to DOCCS policies and customs that were not based on patients' needs or efficacy or on medical judgment. (Dkt. No. 17, ¶¶ 380–82.)[15]

Therefore, Defendants' motion to dismiss is denied with respect to Defendant Cahill.

### 3.   Defendant Mandalaywala

Defendants finally argue that Plaintiff has failed to plausibly allege that Defendant Mandalaywala knew of and disregarded an excessive risk to Plaintiff's health by discontinuing Plaintiff's prescription for Neurontin and Cyclobenzaprine. (Dkt. No. 33-1, at 23–25.) Similarly to their argument with respect to Defendant Cahill, Defendants argue that Plaintiff has not plausibly alleged that Defendant Mandalaywala knew of and disregarded an excessive risk of substantial harm to Plaintiff because Plaintiff has not alleged that Defendant Mandalaywala "was in possession of any information in 2019 . . . sufficient to demonstrate that she was specifically aware of, but disregarded, any substantial risk to Plaintiffs health by discontinuing these

---

[15] Defendants misconstrue Plaintiff's argument related to Defendants' medical judgment. Plaintiff does not argue, as Defendants suggest, that the Court should deny Defendants' motion because there exist questions of fact as to whether Defendants exercised *proper* medical judgment. (Dkt. No. 41, at 9–10.) Rather, Plaintiff argues that he has pleaded a prima facie case of deliberate indifference against Defendants because he has alleged that Defendants' inadequate treatment was "policy driven—and not medical judgment." (Dkt. No. 40, at 16–17); *see Brock*, 315 F.3d at 167; *Stevens*, 535 F. Supp. 2d at 388; *Tavares*, 2015 WL 158863, at *6, 2015 U.S. Dist. LEXIS 3815, at *18.

medications." (Dkt. No. 33-1, at 23.) Defendants also argue that Plaintiff's allegations as to Defendant Mandalaywala "amount to nothing more than a 'mere disagreement over the proper treatment' of Plaintiff's pain." (*Id.* at 23–24 (citations omitted).)

The amended complaint only contains two allegations concerning Defendant Mandalaywala. Plaintiff alleges that Defendant Mandalaywala "had not seen [Plaintiff] before she discontinued his medications" for Neurontin and Cyclobenzaprine on May 3, 2019, when Plaintiff entered Franklin. (Dkt. No. 17, ¶ 338.) Plaintiff also alleges that on October 19, 2020, Defendant Mandalaywala "completed an MWAP and Chronic Pain Patient Reassessment form" on which "she noted that [Plaintiff's] Neurontin was stopped and switched to Elavil and his pain scale was 8 out of 10," and that on this form Defendant Mandalaywala "originally seemed to recommend [Plaintiff] be returned to Neurontin but crossed that recommendation out and suggested only that his Cymbalta be increased." (*Id.* ¶¶ 374–75.) These limited allegations are insufficient to plausibly allege that Defendant Mandalaywala knew of and disregarded an excessive risk to Plaintiff's health. Plaintiff has not alleged, for instance, that Defendant Mandalaywala ever examined Plaintiff, that Plaintiff complained to Defendant Mandalaywala about his chronic pain, or that Defendant Mandalaywala had any involvement in Plaintiff's care beyond discontinuing his medications when he arrived at Franklin and completing an MWAP form over a year later. *See Alston v. Bendheim*, 672 F. Supp. 2d 378, 386 (S.D.N.Y. 2009) (dismissing an Eighth Amendment deliberate indifference claim where the plaintiff alleged neither that "[the defendant] was aware [of the plaintiff's medical condition nor . . . that [the plaintiff] provided such information to [the defendant]"). While the MWAP form that Defendant Mandalaywala completed describes Plaintiff's pain as an "8 out of 10," the form is a request for an increase in Plaintiff's Cymbalta prescription. Given Defendant Mandalaywala's limited

contact with the Plaintiff, Plaintiff has failed to plausibly that allege that by discontinuing his medications on May 3, 2019, and seeking to increase his Cymbalta on October 19, 2020, Defendant Mandalaywala knew of and disregarded an excessive risk to Plaintiff's health. Accordingly, Defendants' motion to dismiss is granted with respect to Defendant Mandalaywala.

## V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss under Rule 12(b)(6), (Dkt. No. 33), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's claims against Defendants Hurley and Mandalaywala are **DISMISSED**; and it is further

**ORDERED** that Defendants Hurley and Mandalaywala are **DISMISSED** from this action; and it is further

**ORDERED** that Defendants' motion to dismiss is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated:  August 15, 2024
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

33